**FULTON MARKET COLD STORAGE COMPANY, Plaintiff-Appellant,**

v.

**P. J. CULLERTON et al., Defendants-Appellees.**

No. 77–2133.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1978.

Decided Aug. 7, 1978.

James L. Fox, Chicago, Ill., for plaintiff-appellant.

Herbert Lee Caplan, Michael F. Baccash, Asst. State's Atty., Chicago, Ill., for defendants-appellees.

Before SWYGERT and TONE, Circuit Judges, and SHARP *, District Judge.

* The Honorable Allen Sharp, United States District Court for the Northern District of Indiana, is sitting by designation.

ALLEN SHARP, District Judge.

## I.

On January 2, 1974 Fulton Market Cold Storage Company ("Fulton") filed a civil rights damage action against the Cook County Assessor under 42 U.S.C. § 1983 and its jurisdictional counterpart 28 U.S.C. § 1343(3). Later Fulton amended its complaint and added a number of defendants and counts. In its amended complaint Fulton, a Cook County Illinois property owner, seeks actual and punitive damages for injuries allegedly inflicted upon it by county and state taxing officials. Fulton charges that these defendants, individually and as parties to a continuing conspiracy, acted and combined under color of law to deprive it of its rights under the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution, the due process provisions of the Illinois Constitutions of 1870 and 1970, Article IX, Section 1 of the Illinois Constitution of 1870, and various provisions of the Illinois Revenue Act, 120 Ill.Rev.Stat. §§ 482 *et seq.*

Specifically, Fulton alleges that from 1958 to 1973, the defendants have systematically, knowingly, intentionally, fraudulently and invidiously assessed its property at levels other than permitted by law and greatly in excess of the levels at which property in Cook County was generally assessed in those years. Fulton alleges that in 1968 and 1969 its property was deliberately assessed at two and one-half times the level at which property was generally assessed in Cook County in those years. Fulton's other allegations charge that the defendants' system of illegal valuations and discriminatory assessments has been widely, wilfully and purposefully practiced in Cook County and has worked substantial injury upon Fulton.

The defendants fall into three groups: (1) Cook County Assessors P. J. Cullerton and Thomas M. Tully ("the Assessor Defendants") who, by statute, had the duty to assess real property in Cook County; (2) Cook County Board of Appeals members ("the County Defendants") who, by statute, had the duty to review and order corrected unlawful assessments brought before them on complaint; and (3) Directors of the Illinois Department of Revenue and the Illinois Department of Local Government Affairs ("the State Defendants") who, by statute, had the duty to equalize the total assessed valuations of the several counties so that such total assessed valuations as equalized equaled the full cash value of the property subject to assessment within the several counties and the duty to order a reassessment for any year in which they found that the assessments in any county were not in substantial compliance with the law.

For relief, Fulton's amended complaint prays for $60,000 plus the sums it has expended in the years 1958 through 1974 in seeking redress from the acts and conduct of the defendants, plus the damage to its business resulting therefrom and punitive damages.

The district court dismissed the plaintiff's amended complaint relying upon 28 U.S.C. § 1341 and its underlying policy considerations. Fulton appealed and the matter is now before this court.

## II.

The central issue now before this court is whether 28 U.S.C. § 1341 or its underlying policy considerations bar the plaintiff's § 1983 suit for damages. After a careful review of all the authority cited by counsel and after an independent search for authority by this court, it appears that no other court has ever directly addressed itself to this precise question. This court and several others have construed § 1341 in cases where the plaintiff was seeking some form of equitable relief, e. g., injunctive or declaratory actions. But no case has been found where this statute was extended to damage actions as well. Consequently, since this appears to be a case of first impression, this court must analyze § 1341 with reference to its legislative history and the significant cases which have construed the statute in order to determine the important underlying policy considerations. Only

then may this court properly resolve the issue.

### III.

*28 U.S.C. § 1341*

Title 28 U.S.C. § 1341 provides:

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under the State law where a plain, speedy and efficient remedy may be had in the courts of such State.

As this court has held in the past, this statute clearly prohibits a district court from issuing an injunction which would "suspend or restrain the assessment, levy or collection of any tax under State law" unless the State remedy is not "plain, speedy and efficient." *28 East Jackson Enterprises, Inc. v. Cullerton,* 551 F.2d 1093 (7th Cir. 1977) (on second petition for rehearing); *see also 28 East Jackson Enterprises, Inc. v. Cullerton,* 523 F.2d 439 (7th Cir. 1975); *Pintozzi v. Scott,* 436 F.2d 375 (7th Cir. 1970); *Tramel v. Schrader,* 505 F.2d 1310 (5th Cir. 1975); and *Bland v. McHann,* 463 F.2d 21 (5th Cir. 1972).

Additionally, despite the fact that § 1341 speaks only of injunctions, this court has held that the statute also bars declaratory actions. *Illinois Central R. Co. v. Howlett,* 525 F.2d 178 (7th Cir. 1975); *Gray v. Morgan,* 371 F.2d 172 (7th Cir. 1966). *See also Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring in part and dissenting in part); *Hickmann v. Wujick,* 488 F.2d 875 (2d Cir. 1973); *American Commuters Ass'n v. Levitt,* 405 F.2d 1148 (2d Cir. 1969).

While it is well settled that § 1341 may bar equitable relief, injunctive and declaratory, it is uncertain whether the policy considerations which underlie § 1341 may also bar an action for damages. To resolve this question properly it is important to examine the legislative history and congressional intent of § 1341.

*Legislative History*

The Fifth Circuit in *Hargrave v. McKinney,* 413 F.2d 320 (1969), explained the context in which § 1341 was enacted:

The expansion of the federal judicial power countenanced by the Supreme Court in *Ex parte Young,* 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, "brought about a major shift in the actual distribution of power between states and nation" which was not "overlooked by Congress, or by the spokesmen of the interests adversely affected." H. Hart and H. Wechsler, The Federal Courts and Federal System, pp. 846–847 (1953). Congress responded to the federal courts' newly-declared power to enjoin actions by state officials in their enforcement of state legislative acts by enacting four major pieces of legislation.

In a footnote, the court specified the legislation:

(1) Three-judge requirement of 1910 presently codified in 28 U.S.C. § 2281. [now repealed Pub.L. 94–381, §§ 1, 2, Aug. 12, 1976, 90 Stat. 1119.]

(2) The stay requirement of 1913 presently codified in 28 U.S.C. § 2284 (last paragraph).

(3) Johnson Act of 1934 prohibiting injunctions against state public utility rate orders—presently codified in 28 U.S.C. § 1342.

(4) Tax Injunction Act of 1937—at issue in the instant case. [codified in 28 U.S.C. § 1341]

*Id.* at 325 and n. 9.

It therefore appears that § 1341 was part of a larger congressional response to *Ex parte Young, supra,* wherein Congress attempted to limit the injunctive power of federal courts.

■ The specific congressional policy considerations which underlie § 1341 are revealed in the Senate Judiciary Committee Report. In the report, two purposes of § 1341 are expressed. First, the statute was directed at the elimination of unjust discrimination between citizens of the State and foreign corporations. It was feared that a foreign corporation, through diversity, could obtain a federal injunction prohibiting the collection of certain state taxes.

Such a procedure, however, was unavailable to a State resident. As the Senate Judiciary Committee Report stated:

> If those to whom the federal courts are open may secure injunctive relief against the collection of taxes, the highly unfair picture is presented of the citizen of the State being required to pay first and then litigate, while those privileged to sue in the federal courts need only pay what they choose and withhold the balance during the period of litigation.

S.Rep.No. 1035, 75th Cong., 1st Sess. 1–2 (1937). The second purpose of § 1341 was also directed at foreign corporations. The primary concern was that foreign corporations, by obtaining a federal injunction, could seriously disrupt the State taxing process. As the Senate Report stated it was possible for

> foreign corporations doing business in such States to withhold from them and their governmental subdivisions taxes in such vast amounts and for such long periods of time as to seriously disrupt State and county finances. The pressing needs of these States for this tax money is so great that in many instances they have been compelled to compromise these suits, as a result of which substantial portions of the tax have been lost to the States without a judicial examination into the real merits of the controversy.

In *Tramel v. Schrader,* 505 F.2d 1310 (5th Cir. 1975), Judge Coleman, writing for the Fifth Circuit, summarized the congressional intent in enacting § 1341:

> In other words, in passing the Tax Injunction Statute, Congress took aim at two evils.
>
> First, Congress noted that some foreign corporations were in the habit of delaying the payment of taxes through an action in federal court since they could invoke diversity jurisdiction. State citizens, on the other hand, could not obtain a federal forum based on diversity jurisdiction. By passing the Tax Injunction Statute, Congress sought to treat the two classes, foreign corporations and resident citizens, alike.

> Second, Congress noted that allowance of injunction suits in the federal courts inevitably resulted in delays in the collection of public revenues by the state and local governments. Because of pressing need for the money, the state and local governments often had to compromise the claims, taking less than what was, in fact, due. By closing the federal courthouse door to taxpayer claims, Congress sought to end this burdensome disruption of local financing.

*Id.* at 1316. *See also Garrett v. Bamford,* 538 F.2d 63 (3d Cir. 1976).

It should be noted that the legislative history of § 1341 speaks only of the concerns that are encountered by the use of injunctions. No mention is made of the applicability of this statute to actions which seek other relief. From a narrow reading of the statute one might infer that Congress intended to restrict only injunctive relief. However, as discussed earlier, this Court and several others have held that Congress' intention was best served by extending the jurisdictional bar of § 1341 to prohibit declaratory actions as well. *Illinois Central R. Co. v. Howlett,* 525 F.2d 178 (7th Cir. 1975); *Gray v. Morgan,* 371 F.2d 172 (7th Cir. 1966); *Hickmann v. Wujick,* 488 F.2d 875 (2d Cir. 1973); *American Commuters Ass'n v. Levitt,* 405 F.2d 1148 (2d Cir. 1969). These cases and others will now be analyzed to determine if the policy considerations and congressional intent of § 1341 would be served by extending the jurisdictional bar of the statute to prohibit damage actions as well.

Prior to the enactment of § 1341, a unanimous Supreme Court of the United States in *Matthews v. Rogers,* 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447 (1932), speaking through Mr. Justice Stone, discussed the sensitive nature of federal injunctions which enjoin the collection of a particular state tax:

> The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal opera-

tions require that such relief should be denied in every case where the asserted federal right may be preserved without it. Whenever the question has been presented, this Court has uniformly held that the mere illegality or unconstitutionality of a state or municipal tax is not in itself a ground for equitable relief in the courts of the United States. If the remedy at law is plain, adequate, and complete, the aggrieved party is left to that remedy in the state courts, from which the cause may be brought to this Court for review if any federal question be involved, Jud.Code § 237, *or to his suit at law in the federal courts if the essential elements of federal jurisdiction are present.* See *Boise [Artesian Hot & Cold] Water Co. v. Boise City,* 213 U.S. 276 [29 S.Ct. 426, 53 L.Ed. 796]; *Shelton v. Platt,* 139 U.S. 591 [11 S.Ct. 646, 35 L.Ed. 273]; *Dows v. Chicago* [78 U.S. 108], 11 Wall. 108, 110, 112 [20 L.Ed. 65]. (emphasis added)

*Id.* 284 U.S. at 525–526, 52 S.Ct. at 219–220.

The Supreme Court's primary concern in *Matthews* centered on the exercise of a federal court's formidable injunctive powers. The opinion apparently would permit a plaintiff to maintain an action at law seeking only damages.

Later in *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943), the Supreme Court of the United States, speaking unanimously through Chief Justice Stone, extended the policy of self-restraint followed by courts in federal equity actions seeking to interfere with the collection of state taxes, a policy approved by Congress in its adoption of § 1341, to declaratory actions:

It is true that the Act of Congress speaks only of suits "to enjoin, suspend, or restrain the assessment, levy, or collection of any tax" imposed by state law, and that the declaratory judgment procedure may be, and in this case was, used only to procure a determination of the rights of the parties, without an injunction or other coercive relief. It is also true that that procedure may in every practical sense operate to suspend collection of the state taxes until the litigation is ended. But we find it unnecessary to inquire whether the words of the statute may be so construed as to prohibit a declaration by federal courts concerning the invalidity of a state tax. For we are of the opinion that those considerations which have led federal courts of equity to refuse to enjoin the collection of state taxes, save in exceptional cases, require a like restraint in the use of the declaratory judgment procedure.

*Id.* at 299, 63 S.Ct. at 1073.

More recently in *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), Mr. Justice Brennan, concurring in part and dissenting in part, reiterated the sensitive policy considerations underlying the federal courts' historic nonintervention in state tax matters:

The special reasons justifying the policy of federal non-intervention with state tax collection are obvious. The procedures for mass assessment and collection of state taxes and for administration and adjudication of taxpayers' disputes with tax officials are generally complex and necessarily designed to operate according to established rules. State tax agencies are organized to discharge their responsibilities in accordance with the state procedures. If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency. Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts. See generally S.Rep.No. 1035, 75th Cong., 1st Sess. (1937). These considerations make clear that the underlying policy of

the anti-tax-injunction statute, 28 U.S.C. § 1341, relied on in *Great Lakes,* bars all anticipatory federal adjudication in this field, not merely federal injunctions.

*Id.* at 127–128 n. 17, 91 S.Ct. at 698.

Several other courts have reached the same conclusions. *See Tramel v. Schrader,* 505 F.2d 1310 (5th Cir. 1975); *Mandel v. Hutchinson,* 494 F.2d 364 (9th Cir. 1974); *Hickmann v. Wujick,* 488 F.2d 875 (2d Cir. 1973); *Bland v. McHann,* 463 F.2d 21 (5th Cir. 1972); *American Commuters Assoc. v. Levitt,* 405 F.2d 1148 (2d Cir. 1969).

Unlike the previous cases which have applied § 1341 and have prohibited equitable relief, two cases have reached different results. In *Wells v. Malloy,* 510 F.2d 74 (2d Cir. 1975), the plaintiff brought an action to enjoin the enforcement of a section of the Vermont Motor Vehicle Purchase and Use Tax Statute. The plaintiff, an indigent, claimed that the sanction for nonpayment of the tax (suspension of his driver's license) violated his constitutional rights. The district court held that the action was barred by § 1341 and dismissed the complaint for want of jurisdiction. The Second Circuit reversed. Judge Friendly, writing for the court, found that the plaintiff was not seeking to restrain the "assessment" or "levy" of a tax under state law. Indeed the plaintiff did not dispute that the tax was due and owing. Nor was the plaintiff's action an attempt to restrain the "collection" of a state tax. Judge Friendly, after examining the legislative history of § 1341, determined that the sanction for nonpayment of the Vermont tax was not encompassed in the term "collection" of § 1341:

> The context and the legislative history, see H.R.Rep. No. 1503, 75th Cong., 1st Sess. 2 (1937); Sen.Rep. No. 1035, 75th Cong., 1st Sess. 1–2 (1937); 81 Cong.Rec. 1415, 1416 (Feb. 19, 1937) (remarks of Sen. Bone), lead us to conclude that, in speaking of "collection", Congress was referring to methods similar to assessment and levy, *e. g.,* distress or execution, compare *Murray's Lessee v. Hoboken Land and Improvement Co.,* 18 How. (59 U.S.) 272, 278, 15 L.Ed. 372 (1856); *Damsky v. Zavatt,* 289 F.2d 46, 50–51 (2d Cir. 1961), that would produce money or other prop-

erty directly, rather than indirectly through a more general use of coercive power. Congress was thinking of cases where taxpayers were repeatedly using the federal courts to raise questions of state or federal law going to the validity of the particular taxes imposed upon them—not to a case where a taxpayer contended that an unusual sanction for non-payment of a tax admittedly due violated his constitutional rights, an issue which, once determined, would be determined for him and all others.

*Id.* at 77.

Thus despite the fact the plaintiff did not pursue any state remedies, the court held that § 1341 did not bar his action.

In *Hargrave v. McKinney,* 413 F.2d 320 (5th Cir. 1969), the Fifth Circuit held that § 1341 did not bar an action which challenged the constitutionality of a Florida statute.

■ After analyzing these cases it is clear that § 1341 bars any action which seeks equitable relief which if granted would disrupt the state taxing process. Thus an action which seeks to enjoin the "assessment, levy or collection of any tax under state law" may be prohibited. Likewise, an action which seeks a declaratory judgment may also be barred, since a declaration that a particular state tax statute is unconstitutional would have a crippling effect upon the state taxing process. So long as the states provide plaintiffs with a "plain, speedy and efficient remedy" in the state courts, the plaintiffs are precluded from pursuing equitable relief in federal courts.

The cases in this circuit are in accord. *28 East Jackson Enterprises, Inc. v. Cullerton,* 523 F.2d 439 (7th Cir. 1975), on second petition for rehearing, 551 F.2d 1093 (7th Cir. 1977); *Illinois Cent. R. Co. v. Howlett,* 525 F.2d 178 (7th Cir. 1975); *Gray v. Morgan,* 371 F.2d 172 (7th Cir. 1966). In each case, the plaintiffs were seeking some form of equitable relief which, if granted, would have disrupted the state taxing process. In *Cullerton, supra,* the plaintiffs were seeking an injunction. In *Illinois Cent. R. Co., supra,* the plaintiffs were seeking a declarato-

ry judgment. In *Gray, supra,* the plaintiffs were seeking an injunction, declaratory judgment and a tax refund. In each case this court determined that the plaintiffs had an adequate state remedy and held that § 1341 barred the action. As Chief Judge Hastings stated in *Gray:*

> We hold that § 1341 means what it says, and having determined to our own satisfaction that plaintiffs have available to them a plain, speedy and efficient remedy in the Wisconsin state courts, they may not use a federal forum to seek the equitable relief sought here against the state income taxes in question.

371 F.2d at 175.

## IV.

■ In the present case the plaintiff argues that the significant difference is the relief sought. Fulton concedes that were it seeking some form of equitable relief § 1341 would bar its suit. However, since it seeks damages for the allegedly wrongful conduct of officials, Fulton argues that § 1341 or its underlying policy considerations are inapplicable. Furthermore, Fulton contends that the purpose of § 1983 suits would be thwarted if § 1341 were construed to bar damage actions as well.

This court agrees with the plaintiff's argument. As has been demonstrated, § 1341 is directed at prohibiting equitable relief. The statute, its legislative history and significant cases indicate that the primary evil to be avoided is federal equitable relief which would disrupt the state taxing process. A federal court injunction or declaratory judgment would not only undermine and jeopardize a state's ability to collect its revenue but would also seriously damage the delicate balance inherent in our federalistic system of government.

These concerns are not present in a suit for damages. In the present case the plaintiff is not seeking to enjoin any taxing process. Nor will a judgment for the plaintiff have that effect. Fulton is seeking damages for the alleged wrongful and intentional conduct of certain officials who allegedly deprived Fulton of constitutional rights while acting under color of state law. Fulton seeks relief which is retrospective, i.

e., compensation for harm done, unlike equitable relief which is anticipatory or prospective. Additionally, the outcome of the present suit does not pivot upon the construction of some state statute or tax regulation which should more properly be construed by appropriate state courts. The issue is not whether a state statute is constitutionally valid but rather whether an official's conduct violated established constitutional standards. This is precisely the purpose of § 1983 suits. As Mr. Justice Douglas stated, writing for the Supreme Court of the United States in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961):

> There can be no doubt at least since *Ex parte Virginia,* 100 U.S. 339, 346–347 [25 L.Ed. 676], that Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it. See *Home Tel. & Tel. Co. v. City of Los Angeles,* 227 U.S. 278, 287–296 [33 S.Ct. 312, 57 L.Ed. 510].

*Id.* at 171–172, 81 S.Ct. at p. 476.

Later, in *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), the Supreme Court of the United States reiterated that position:

> Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.

*Id.* at 239, 92 S.Ct. at p. 2160 (footnote omitted).

And more recently in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), Mr. Justice Powell writing for the court stated:

> The legislative history of § 1983, elsewhere detailed, *e. g., Monroe v. Pape,* 365 U.S. 167, 172–183 [81 S.Ct. 473, 476–481, 5 L.Ed.2d 492] (1961); *id.,* at 225–234 [81 S.Ct. 504–509] (Frankfurter, J., dissenting in part); *Mitchum v. Foster,* 407 U.S. 225, 238–242 [92 S.Ct. 2151, 2159–2161, 32 L.Ed.2d 705] (1972), demonstrates that it

was intended to "create[ ] a species of tort liability" in favor of persons who are deprived of "rights, privileges, or immunities secured" to them by the Constitution. *Imbler v. Pachtman,* 424 U.S. 409, 417 [96 S.Ct. 984, 996, 47 L.Ed.2d 128] (1976).

*Id.* at 253, 98 S.Ct. at 1047.

■■ It should be noted that the fact that the plaintiff in this suit is a corporation is of no legal significance. While a corporation is not a "citizen" within the meaning of the privileges and immunities clause, *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Orient Ins. Co. v. Daggs,* 172 U.S. 561, 19 S.Ct. 281, 43 L.Ed. 552 (1899); *Paul v. Virginia,* 75 U.S. (8 Wall) 168, 19 L.Ed. 357 (1868); *see also Asbury Hospital v. Cass County, N.D.,* 326 U.S. 207, 66 S.Ct. 61, 90 L.Ed. 6 (1945), a corporation is a "person" within the meaning of the equal protection and due process of law clauses of the Fourteenth Amendment, *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); *Adams v. City of Park Ridge,* 293 F.2d 585 (7th Cir. 1961); *Advocates for Arts v. Thompson,* 532 F.2d 792 (1st Cir. 1976); *Raymond Motor Transportation, Inc. v. Rice,* 417 F.Supp. 1352 (3-Judge Dist. Ct. W.D. Wis. 1976). Accordingly, Fulton, the corporate plaintiff, may maintain a § 1983 action to secure the protection and guarantees accorded to it under the Fourteenth Amendment.

Furthermore, as announced in *Lynch v. Household Finance Corp.,* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), the distinction between personal liberties and proprietary rights as a guide to the contours of a § 1343(3) jurisdiction is likewise meaningless. It is true that the Supreme Court in *Lynch* in footnote 6 indicated an exception to this rule in cases which were barred by § 1341. However, since this court has already determined that § 1341 is inapplicable, the exception alluded to in the footnote in *Lynch* is likewise inapplicable.

■ The defendants argue that the policy considerations of § 1341 would be best served by this court holding that § 1341 bars all actions, equitable and legal. We cannot agree. After reviewing the statute, its legislative history and significant cases we can find no evidence which would indicate that § 1341 was directed at damage actions as well as equitable actions. Clearly if Congress had intended to prohibit all federal court relief in state tax matters, it could have done so. Congress, however, did not address the subject of damage actions. Congress thus did not give state tax officials absolute immunity for acts committed in their official capacity. Congress only prohibited certain specific remedies which due to their nature are highly disruptive of state proceedings. Quite clearly, if a county or state tax official intentionally and unjustifiably raised an individual's property assessment merely because of the individual's race, ethnic background or political affiliation, the official could be liable for damages under § 1983 for the misuse of his authority. Section 1341 only bars certain forms of relief; it does not serve to deprive a federal court of jurisdiction of all actions merely because the defendant is a state or county tax official. If a state or county tax official intentionally violates a plaintiff's constitutional rights, he may be held liable for an action for damages.

We note that in a recent decision of this court the point we decide today was assumed by the parties and the court. In *Sacks Brothers Loan Co. v. Cunningham,* 578 F.2d 172 (1978), the plaintiff filed an action against the tax assessor of Marion County, Indiana seeking damages and equitable relief pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983. The gravamen of the complaint was that the imposition of an Indiana personal property tax on certain tangible personal property held by the plaintiff violated the plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment. The district court dismissed the plaintiff's claim for equitable relief relying upon 28 U.S.C. § 1341 and dismissed the claim for damages for failure to state a claim upon which relief can be granted. This court affirmed the district court's denial of equitable relief but reversed the district court's dismissal of the plaintiff's damage action on the ground

that the district court had applied the incorrect statute of limitations for damage actions arising under § 1983. In so doing, this court necessarily assumed the existence of a § 1983 cause of action for damages against a county tax assessor.

While we now hold that § 1341 does not bar a § 1983 action for damages, that is not to say that whenever a tax official raises a property assessment he exposes himself to a § 1983 suit. In order to insure that county or state tax officials will not exercise their legitimate discretion with undue timidity for fear of suit, they are entitled to a good faith defense as announced in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Therefore, we hold that a state or county tax official will be liable for damages under § 1983 only if he violated the plaintiff's clearly established constitutional rights intentionally or with reckless disregard of those rights. Inadvertence or negligence will not be enough. Thus, to paraphrase *Wood v. Strickland, supra,* a compensatory award will be appropriate only if the tax official has acted with an impermissible motivation or with such intentional or reckless disregard of the plaintiff's clearly established constitutional rights that his action cannot be reasonably characterized as being in good faith. *Id.* at 332, 95 S.Ct. 992. *See also Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

█ Furthermore, while we now hold that the plaintiff has stated a cause of action under § 1983, we leave for the district court to determine on a more complete record whether any of the defendants have had the necessary personal involvement to incur liability. As this court has held in *Adams v. Pate,* 445 F.2d 105 (7th Cir. 1971), there is no vicarious liability under § 1983; *respondeat superior* is inapplicable. *See also Monell v. Department of Social Services of the City of New York,* —— U.S. ——, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Draeger v. Grand Central, Inc.,* 504 F.2d 142 (10th Cir. 1974); *Johnson v. Glick,* 481 F.2d 1028 (2d Cir. 1973); *Jennings v. Davis,* 476 F.2d 1271 (8th Cir. 1973). Accordingly, any defendant who did not personally and intentionally or with reckless disregard violate the plaintiff's constitutional rights will not be held liable for damages. This is a matter which the district court must address on remand and may address preliminarily to any trial on the merits.

Another issue the district court will address on remand is whether any of the plaintiff's claims is barred by the appropriate statute of limitations. Since the district court dismissed the plaintiff's complaint relying upon 28 U.S.C. § 1341, it never reached the statute of limitations question. Although the defendants have argued the question on appeal, we feel the better course, in light of our opinion today, is to permit the district court to address the issue upon a more complete record and following our decision in *Beard v. Robinson,* 563 F.2d 331 (7th Cir. 1977). Therefore, on remand, the district court must decide this statute of limitations question on a fully developed record.

█ The defendants also argue that even if the plaintiff has stated a cause of action under § 1983 that the district court should abstain or defer because the plaintiff has not exhausted his state remedies. We find no merit in this argument and see no reason why this § 1983 action should be treated differently from others where exhaustion is not required. As stated in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), referring to § 1983 actions:

> It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.

*Id.* at 183, 81 S.Ct. at 482.

*See also McNeese v. Board of Ed. for Com. Unit, Sch. Dist. 187,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Drexler v. Southwest Dubois School Corp.,* 504 F.2d 836 (7th Cir. rehearing en banc 1974). Even if § 1983 were a supplementary remedy, *see Askew v. Hargrave,* 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971), the unavailability in the Illinois courts of certain elements of plaintiff's damage, i. e., interest and attorneys' fees, would make the federal remedy necessary to afford complete relief.

Accordingly, in light of all the foregoing, we now hold that the plaintiff, Fulton Market Cold Storage Company, has stated a cause of action under 42 U.S.C. § 1983 which is not barred by 28 U.S.C. § 1341. The order of the district court is therefore now REVERSED and the case now REMANDED for proceedings consistent with this opinion.